PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3032
_____

BEKHZOD BAKHTIYAROVICH YUSUPOV,
a/k/a Bekhzod Yusupov,
                                        Petitioner
v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent

_____

No. 09-3074
_____

ISMOIL SAMADOV,
                                        Petitioner
v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent
_____

On Petition for Review of an Order
of the Board of Immigration Appeals
(Nos. A 079-729-905, A 079-729-711)
Immigration Judges:  Hon. Walter A. Durling (Yusupov)
                     Hon. Grace A. Sease (Samadov)

_____

Argued December 14, 2010

Before: SLOVITER, GREENAWAY, JR., and
STAPLETON, Circuit Judges

(Filed: June 16, 2011)

———

Lawrence H. Rudnick  (Argued)
Steel, Rudnick & Ruben
Philadelphia, PA  l9l03

        Attorney for Petitioner Bekhzod Yusupov

Baher A. Azmy   (Argued)
Anjana Malhotra
Seton Hall Law School
Newark, NJ  07102

        Attorneys for Petitioner Ismoil Samadov

Eric H. Holder, Jr.
Thomas W. Hussey
Lyle D. Jentzer  (Argued)
John M. McAdams, Jr.
United States Department of Justice
Office of Immigration Litigation
Washington, DC  20044

        Attorneys for Respondents

Naureen Shah
Columbia University School of Law
New York, NY  10027

Robin L. Alperstein
Becker, Glynn, Melamed & Muffly
New York, NY  10171

Carl J. Micarelli
Debevoise & Plimpton
New York, NY  10022

        Attorneys Amicus Curiae

———

OPINION OF THE COURT

_____

SLOVITER, *Circuit Judge.*

A federal statute, Immigration and Nationality Act ("INA") § 241(b)(3)(B)(iv), 8 U.S.C. § 1231(b)(3)(B)(iv), precludes withholding of removal if "there are reasonable grounds to believe that the alien is a danger to the security of the United States." In November 2003, the Government of Uzbekistan requested the extradition of, inter alia, Petitioners Bekhzod Yusupov and Ismoil Samadov (collectively "Petitioners"), asserting they participated with others in a movement seeking the "forced overthrow" of the Republic of Uzbekistan, and the establishment on its territory of a "religious extremist Islamic fundamental state." Y.App. at 705, S.App. at 2993.[1] After hearing testimony that it was merely pretext for persecution, both Immigration Judges ("IJs") concluded that the extradition request would be given no weight, "coming from a government such as this with a history of engaging in persecution and using torture as a sovereign tool." *In Re Yusupov*, No. A 79-729-905, at 10 (IJ Dec. Nov. 19, 2004). In addition, Uzbekistan stimulated Interpol notices seeking assistance in locating Petitioners. The Government now asserts that there are reasonable grounds to believe both Petitioners are a danger to the security of the United States.

These consolidated cases were previously before this court. In *Yusupov v. Att'y Gen.*, 518 F.3d 185, 201 (3d Cir. 2008) ("*Yusupov I*"), this court overruled the Attorney General's construction of the national security exception that required merely that a person "may" pose a danger to our security and held that the provision only applies to an

_____

[1] Each Petitioner filed a separate Appendix. We refer to that filed by Yusupov as "Y.App." and filed by Samadov as "S.App." The appendix located at the back of Yusupov's opening brief will be referred to as "Y.Br.App."

individual who actually "is" a danger. Because the Board of Immigration Appeals ("BIA") evaluated Petitioners' cases under the incorrect standard, this court remanded to the BIA without passing on the merits. On remand, the BIA found that Petitioners are a danger to national security and are thus ineligible for withholding of removal. The BIA, however, granted the Petitioners deferral of removal under the United Nations Convention Against Torture ("CAT") finding it more likely than not that Petitioners would be persecuted and tortured on account of their religion and political opinion if returned to Uzbekistan. We are now called on to consider whether substantial evidence supports the BIA's determination that Petitioners pose an actual, present danger to the security of the United States.[2]

## I.

## Background

## A. Factual Overview

Yusupov and Samadov are two nationals of Uzbekistan who claim to be Independent Muslims and followers of Imam Obidkhon Nazarov. Nazarov and his followers have been subject to persecution since the early 1990s by the Uzbek Government, known for its silencing of dissent and its "very poor" human rights track record, charges also maintained by the U.S. Government. S.App. at 2170-73, Y.App. at 108. Petitioners left Uzbekistan in 1999, allegedly to pursue educational opportunities in the United States, and are now unwilling to return for fear of persecution.

Yusupov and Samadov both testified at their respective initial hearings that they had only peacefully attended their mosques in their homeland and had engaged in no violent or

---

[2] This court expresses its gratitude to Amici Curiae – Columbia Law School's Human Rights Institute; the Asian American Legal Defense and Education Fund et. al. ("AALDEF") and Immigration Law Scholars – for their submissions.

subversive activity.  Both reported that in 2001, after they were in the United States, a former roommate, surname Oripjanov, was tortured and interrogated in Uzbekistan and forced to sign false allegations against them.  This, they testified, precipitated Uzbekistan's issuance of the extradition requests and Interpol warrants charging them with participating in activities in support of an illegal, religious, extremist movement.  The IJ presiding at Yusupov's hearing concluded that "after listening closely to his testimony, and examining the voluminous evidence of record, [he] found respondent to have testified credibly." *In re Yusupov*, No. A 79-729-905, at 9 (IJ Dec. Nov. 19, 2004).  After hearing this testimony, Samadov's IJ similarly concluded as follows:

> The Court has carefully reviewed that extradition request.  It does not charge the respondent with any specific incident. . . .  It appears that the respondent is being sought by the government of Uzbekistan because of his religious beliefs.
>
> Based upon the documentary evidence that has been provided in this case, the reports of the State Department, about the religious Freedom Report and the Human Rights Report, the report from Human Rights Watch, the other corroborating evidence, the Court finds that the respondent's testimony when placed against this evidence is extremely credible.

S.App. at 46.

Neither of these findings regarding the credibility of Petitioners has subsequently been withdrawn by the IJ or found by the BIA to be clearly erroneous.[3]  Indeed, the BIA

---

[3] As noted hereafter, *see infra* text at 8, Samadov's IJ found some of his testimony at a subsequent hearing to be

5

on review, expressly found "no clear error in [Yusupov's] Immigration Judge's credibility determination regarding . . . the Uzbek extradition request and INTERPOL warrant." *In Re Yusupov*, No. 79-729-905, at 3 (BIA Dec. June 18, 2009).

Meanwhile, in 2002, after receiving notice of criminal charges against Petitioners in Uzbekistan, the United States initiated an investigation during which Petitioners consented to a search of their shared home and computer. The search revealed cached video clips of Osama bin Laden and an alleged Chechen militant and what appear to be attacks on Russian troops and vehicles, a map of Pennsylvania State Police facilities, and an email addressed to Petitioners' former roommate, Erkinjon Zakirov, also an Uzbek national, that references "jihad."[4] *See Yusupov I*, 518 F.3d at 190-92.

---

"not credible." However, this testimony related solely to Samadov's residence and activities after coming to this country. She did not retreat from her prior findings regarding the extradition request, the warrant, and Samadov's activities abroad. S.App. at 23-28. To the contrary, at this subsequent stage, the IJ relied upon the same "documentary evidence" regarding Uzbekistan's treatment of Independent Muslims in support of her conclusion that Samadov would be tortured upon his return to his home country.

[4] The email reads:

In the name of God.
Peace upon you.
Abu Ismoil, my brother

In my letter to PAHKAN I asked him questions you wanted me to.
1- It is a possibility for You in particular and Otabek to get out from there, but it will require from us a lot of enormous amount of hard work with lots of difficulties. Therefore, if you can, please stay there, you will be serving Islam a

The Government initiated removal proceedings against Petitioners. Petitioners conceded removability and applied for asylum, withholding of removal, and CAT relief.

In March 2004, IJ Grace A. Sease granted Samadov's application for withholding of removal under the INA.[5] S.App. at 46. The BIA affirmed. Later that year, the Government moved to reopen Samadov's case on the ground

---

> big favor, your stay there will be a great jihad in the name of God.
>
> 2- [PAKHAN] said that Abdu Wali Qorakan's classes on how to bring the Muslim religion into Uzbekistan will happen. You will be meeting him and taking instructions directly from him.
>
> 3- Regarding the boy you mentioned. (The idea is good to save the boy from the [National Security Council of Uzbekistan] but this requires a large amount of money, [PAKHAN] suggested not to pay the money before the boy is out, otherwise the prices will keep going up and all will be wasted.
>
> Ask for patience from God. Be patient, you are on a great path, the jihad in the name of God.
> DO NOT FORGET TO GET MARRIED!!! Please hurry!!! All will be fine, with God's blessing!!
> God will keep you safe.
> As you see, we have many difficulties.
> Sincerely yours, brother:
> Abu Ibroiym

S.App. at 1073.

[5] *See* INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A) (statutory withholding of removal); 8 C.F.R. § 1208.16(c) (withholding of removal under the Convention Against Torture).

that it had obtained new, previously unavailable evidence, namely the files extracted from the shared computer, that supported a finding that he was a danger to the security of the United States.[6]

At the reopened hearing, the Government presented testimony only of Mark Olexa, an agent of the Department of Homeland Security ("DHS") Joint Terrorism Task Force working out of Philadelphia, Pennsylvania. Agent Olexa was unable to translate the non-English writing superimposed on one of the videoclips or provide additional detail regarding the contents of several of the videos due to his lack of familiarity with the language.[7] S.App. at 393-414. Olexa never interviewed Samadov about the materials or other evidence, and did not identify who had downloaded the files to the shared computer. He based his opinion that Samadov had engaged in "extremist activity" primarily on the allegations in the extradition request. S.App. at 408. After the hearing, IJ Sease found Samadov's testimony regarding the computer and his activities in this country to be "not credible." Although the IJ held that he was ineligible for withholding of removal as a danger to national security, she found Samadov eligible for deferral under the CAT. *In re Samadov*, A 79-729-711, at 14-15 (IJ Dec. Aug. 2, 2005). In May 2006, the BIA affirmed.

In November 2004, in separate proceedings, IJ Walter A. Durling, who was presiding at Yusupov's hearing, found him to be credible and held that there were not reasonable

---

[6] The FBI seized the computer in June 2002, but the Government took almost two years to fully sort and translate the materials. Because Yusupov's hearing was held after that of Samadov's first hearing, the computer materials were presented to the immigration court in Yusupov's case in the first instance.

[7] In presenting his testimony, he relied on information provided by "someone familiar with the Russian language" and other FBI agents. S.App. at 402.

grounds to believe he is a danger to national security. The IJ granted Yusupov's applications for withholding of removal and CAT relief.[8] The IJ found it significant that the Government "did not produce any writing or correspondence pertaining to [Yusupov] that suggests any violent intentions or proclivities, nor has [it] suggested his collaboration or friendship with anyone in the United States considered of violent repute." *In re Yusupov*, No. A 79-729-905, at 6 (IJ Dec. Nov. 19, 2004).

IJ Durling noted the Government's argument that its threshold for establishing a reason to believe an alien is a danger is "low." *Id.* at 8. IJ Durling stated that even accepting that argument, this "requires at least a modicum of evidence," and "some nexus between an alien's presence in the United States and his activities or beliefs which quantify him as a security risk," which the Government failed to provide. *Id.* The IJ afforded the politically motivated extradition request no weight with regard to the allegations of criminal misconduct. *Id.* at 10. In August 2005, the BIA reversed the IJ's grant of withholding of removal on national security grounds but upheld the grant of deferral of removal for Yusupov under the CAT.

Yusupov and Samadov petitioned for review and this court consolidated the petitions.

## B. Third Circuit Remand

In *Yusupov I*, this court did not comment regarding the sufficiency of the evidence as to whether either Petitioner falls within the national security exception. Rather, we limited our decision to an interpretation of the statutory language that provides withholding of removal is unavailable if "there are reasonable grounds to believe that the alien is a danger to the security of the United States." INA § 241(b)(3)(B)(iv), 8 U.S.C. § 1231(b)(3)(B)(iv). We deferred to the Attorney General's interpretation that reasonable

---

[8] The Government also presented Agent Olexa as a witness at Yusupov's hearing.

grounds to believe is satisfied "if there is information that would permit a reasonable person to believe," a standard akin to probable cause in criminal cases. *Yusupov I*, 518 F.3d at 200. In addition, we found that the Attorney General was reasonable to interpret the exception as allowing the consideration of any evidence that is "not intrinsically suspect," including evidence that would not be admissible under the Federal Rules of Evidence. *Id.* (internal quotation omitted).

However, as relevant here, we overruled the Attorney General's reading of the statutory phrase "is a danger" as requiring merely that an alien "may pose" a danger. *Id.* at 201. Instead, we held that the provision applies only to individuals who "actually" pose a danger, reasoning that the term "is" simply "does not mean 'may.'" *Id.* We refrained from determining the "contours of risk to our Nation's defense, foreign relations, or economic interests" that would pose the requisite danger, deferring to the Attorney General's interpretation that the danger must be "nontrivial." *Id.* We found the standard "includes an inherent seriousness requirement." *Id.* at 204 (noting that "the Attorney General was not unreasonable . . . to ensure that immigration judges do not consider trivial dangers in applying the national security exception"). This court remanded to the BIA for application of the correct standard.

## C. BIA on Remand

### 1. Yusupov

On remand, the BIA again reversed the decision of IJ Durling granting Yusupov withholding of removal and finding that Yusupov was not a danger to the security of the United States. In so doing, the BIA engaged in de novo review because it concluded that such a determination "concerns an issue of fact and law." *In re Yusupov*, No. A 79-729-905, at 2 (BIA Dec. June 18, 2009) (citing 8 C.F.R. § 1003.1(d)(3)(ii) and *Matter of V-K-*, 24 I. & N. Dec. 500 (BIA 2008)). Although the BIA found "no clear error in the [IJ]'s credibility determination regarding [Yusupov's]

10

explanations of the reasons for downloading files on his computer, or the potential that the Uzbek extradition request and INTERPOL warrant are politically motivated," it nonetheless determined that "[t]here is considerable evidence to support the [Government's] claim that there are reasonable grounds to believe that [Yusupov] presents an actual danger to national security." *Id*. at 2-3.

The BIA relied on the following evidence to support its determination: (1) the extradition request; (2) the Interpol warrant; (3) cached video clips found on the shared computer; (4) the email sent to Zakirov, a sometime roommate of Petitioners, referring to his "role" in a "big jihad;" (5) a publicly available Pennsylvania Police facilities map from the shared computer; (6) entry by Yusupov, Samadov, and their roommate Zakirov to the United States on student visas, none of whom attended school for any length of time; (7) Yusupov's 2003 misdemeanor conviction for representing himself as a United States citizen on a job application; and (8) Yusupov's attempt to "evade detention" upon learning that the federal government sought to apprehend his roommates and his initial failure to provide his residence to investigators. *Id.* The BIA, however, upheld the IJ's decision granting Yusupov CAT deferral, finding it is more likely than not that he would be tortured if returned.

One member of the BIA panel dissented in a brief footnote, stating:

> On further reflection, Board Member Filppu finds the favorable credibility assessement [sic] below significant, and thus respectfully dissents. The Immigration Judge was not clearly erroneous in crediting [Yusupov's] innocent explanations for what would otherwise be reasonable concerns respecting his danger to the United States. Accepting those explanations as true, in the context of this case, supports the ruling below, and [the Government's] appeal should be dismissed.

11

*Id*. at 5.

   *2. Samadov*

   On remand, the BIA again upheld the 2005 decision of IJ Sease denying Samadov withholding of removal as a danger to the security of the United States. In so doing, the BIA upheld the IJ's adverse credibility determination and found that "[t]here is considerable evidence to support the [Government's] claims that there are reasonable grounds to believe that [Samadov] presents an actual danger to national security." *In re Samadov*, No. A 79-729-711, at 2 (BIA Dec. June 18, 2009).

   The BIA relied on the following evidence similar to that it considered in connection with Yusupov's appeal to support its determination: (1) the extradition request; (2) the Interpol warrant; (3) the video files; (4) the "jihad" email;[9] (5) the Pennsylvania Police facilities map; (6) entry by Samadov and Zakirov to the United States on student visas, neither of whom attended school for any length of time; (7) the attempt to evade detention by Samadov's former roommates, Yusupov and Zakirov; and (8) Samadov's conflicting testimony regarding whether he had "given and received thousands of dollars from groups or individuals" in Central Asia. *Id*. at 2-3. The BIA here too upheld the IJ's decision granting Samadov CAT deferral because it is more likely than not he would be tortured if returned to Uzbekistan.

   Yusupov and Samadov timely appeal.

## II.

**Jurisdiction and Standards of Review**

_____

   [9] The Government initially argued that this email had been sent to Samadov, but it became clear during the reopened proceedings that the email was addressed to Zakirov. Indeed, the IJ questioned whether the Government would have successfully reopened the case based on the other materials alone. S.App. at 463-64.

We have jurisdiction to review the BIA's final orders of removal under INA § 242(a)(1), 8 U.S.C. § 1252(a)(1). *See also Yusupov I*, 518 F.3d at 195-96. We review de novo constitutional claims or questions of law and the application of law to facts with appropriate agency deference. INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D); *Yusupov I*, 518 F.3d at 197. We uphold the BIA's factual determinations if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Li v. Att'y Gen.*, 400 F.3d 157, 162 (3d Cir. 2005) (internal quotation omitted); *see also* 8 U.S.C. § 1252(b)(4)(B) ("administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). We review the IJ's findings under this same substantial evidence standard to the extent "the BIA directs us to the opinion and decision of the IJ who originally assessed [the] application." *Shah v. Att'y Gen.*, 446 F.3d 429, 434 (3d Cir. 2006) (alteration in original) (internal quotation omitted).

## III.

## Analysis

### A. Forms of Relief

We begin our analysis with a brief discussion of the forms of relief at issue in this petition. Yusupov and Samadov were both granted deferral of removal under the CAT. Petitioners bring this appeal in part to afford them withholding of removal, under the INA and the CAT, which they argue provides superior procedural and substantive rights.[10]

---

[10] Yusupov concedes that he is ineligible for asylum for his failure to file an application within one year of his entry. Although Samadov correctly states that the BIA in its most recent decision did not consider his claim that his asylum application was timely, in its first decision the BIA specifically affirmed the IJ's denial of asylum for failure to file within one year of arrival. This court lacks

Consistent with our *nonrefoulement* obligations under the 1967 United Nations Protocol Relating to the Status of Refugees, section 241(b)(3)(A) of the INA, 8 U.S.C. § 1231(b)(3)(A), prohibits removal of an individual unlawfully in this country if the Attorney General believes that the individual's life or freedom would be threatened in the country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion (statutory withholding of removal).[11] Credible testimony alone may be sufficient to sustain the burden of proof without further corroboration. 8 C.F.R. § 1208.16(b). In addition, the CAT, as codified in regulation, provides for withholding of removal if it is more likely than not that an individual would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c).

Withholding of removal under both the INA and the CAT is precluded if "there are reasonable grounds to believe that the alien is a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv); 8 C.F.R. § 1208.16(d)(2). "If the evidence indicates the applicability of [the national security exception], the applicant shall have the burden of

jurisdiction to review discretionary findings regarding timeliness. *See Sukwanputra v. Gonzales*, 434 F.3d 627, 634 (3d Cir. 2006). Because the BIA has already decided the issue, remand for this reason would likely be futile.

[11] As explained in *Yusupov I*, 518 F.3d at 202-03, the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107, amended existing law on withholding of removal to conform it to Article 33 of the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 ("1967 Protocol"). Article 33.1 of the 1967 Protocol, to which the United States is party, expresses the principle of *nonrefoulement* that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of [the protected grounds]."

proving by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1208.16(d)(2). The national security exception, however, does not preclude grant of temporary deferral of removal under the CAT if there is a likelihood of torture. 8 C.F.R. § 1208.17(a).

This court recognizes that withholding of removal provides greater protection and freedom than deferral of removal. Indeed, deferral is a more easily revocable form of relief, which would leave Petitioners vulnerable. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 240 n.3 (3d Cir. 2008). The Government can also invoke an adverse security determination to detain Petitioners indefinitely and place them on restrictive supervised release.[12] *See* 8 U.S.C. § 1231(a)(3)(D); 8 C.F.R. § 1241.14. Although withholding like deferral does not provide the basis for adjustment to legal permanent resident status, deferral recipients who are found to be a danger to national security are considered inadmissible or deportable, which makes them per se "ineligible to receive visas . . . to the United States." 8 U.S.C. § 1182(a)(5). In contrast, if granted withholding Petitioners would have no per se bars to adjustment of status, and would thus be able to obtain permanent residency through marriage, work, or family.

Under the statutory scheme, the question whether an alien is a danger to the United States arises only once the IJ or BIA has found the alien is likely to be persecuted or tortured if removed to the country of nationality. Absent such a finding, the alien would be removed without consideration of his or her danger to the United States. However, both Immigration Judges and the BIA agreed that Yusupov and Samadov are likely to be tortured if removed. Thus, notwithstanding Congress' determination that restrictions on

---

[12] During the course of these proceedings, Petitioners spent three years in immigration detention. Although Petitioners have since been released, the immigration service "continues to subject them to strict curfews, travel restrictions and twenty-four hour electronic monitoring." Petitioners' 28(j) Letter dated Dec. 28, 2010.

15

removal are warranted if there are reasonable grounds to believe an alien poses a danger to national security, courts must strictly interpret exceptions to *nonrefoulement* precisely because they are applied to those determined to be deserving of protection. *See Yusupov I*, 518 F.3d at 203-04 (In enacting the 1980 Refugee Act, "Congress intended to protect refugees to the fullest extent of our Nation's international obligations. Indeed . . . Congress intended to allow exceptions to our *nonrefoulement* obligations only in a narrow set of circumstances."); *see also Xu Sheng Gao v. Att'y Gen.*, 500 F.3d 93, 98 (2d Cir. 2007) (narrowly interpreting bar to withholding because it would authorize deportation of individuals who have established that they would likely be persecuted if returned).

## B.  BIA Standard of Review

Petitioners argue that the BIA misapplied its standard of review and failed to properly credit the IJ's findings of fact.  In 2002, the Attorney General issued procedural reforms clarifying the BIA's scope of review.  *See* 8 C.F.R. § 1003.1(d)(3).[13]  Where the BIA reviews "a mixed question of

---

[13] Section 1003.1(d)(3) provides:

> (i) The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.
> (ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo. . . .
> (iv) Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in

law and fact . . . now referred to as a discretionary decision," it should "defer to the factual findings of the immigration judge unless clearly erroneous," but it retains "independent judgment and discretion, subject to the applicable governing standards, regarding the review of pure questions of law and the application of the standard of law to those facts." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,888-89 (Aug. 26, 2002) (internal quotation omitted).

As such, when evaluating an immigration judge's determination whether there are reasonable grounds to believe an alien is a danger to the United States, the underlying circumstances – e.g. whether Yusupov watched the videos and why or whether he attended English classes – are factual questions subject to clear error review by the BIA. On the other hand, when the BIA determines whether those facts give rise to a reasonable belief that an alien is a danger to national security it has before it a mixed question of law and fact that requires its application of a legal standard to facts as to which it retains "independent judgment and discretion."[14]

---

factfinding in the course of deciding appeals.

[14] Yusupov argues that whether there are reasonable grounds to believe he is a danger is a question of fact akin to a likelihood determination, or a prediction of future events, subject to clear error review, not de novo. Yusupov misplaces reliance on two recent opinions of this court. *See Kaplun v. Att'y Gen.*, 602 F.3d 260, 269-71 (3d Cir. 2010) (under CAT, probability of future torture is finding of fact subject to clear error review, but whether future events rise to level of torture is a legal question reviewed de novo); *Huang v. Att'y Gen.*, 620 F.3d 372, 383, 387 (3d Cir. 2010) (extending *Kaplun* to asylum context, forecasting of what might happen to an applicant if returned is a factual question subject to clear error review, but whether events rise to the level of persecution and give rise to a well-founded fear are reviewed de novo). *Kaplun* and *Huang* are inapposite except to the

17

This follows our previous holding that whether there are reasonable grounds to believe an applicant is a danger is akin to a probable cause determination that requires a finding that an applicant "is" an actual and present danger. *Yusupov I*, 518 F.3d at 200-01. Probable cause determinations are reviewed de novo. *See Harshbarger v. Regan*, 599 F.3d 290, 292 n.3 (3d Cir. 2010).

Although the BIA stated that it left the IJ's positive credibility determination undisturbed and accepted Yusupov's innocent explanations as true, we review the BIA's actions rather than its statements. We agree with Yusupov that notwithstanding the BIA's own regulation that states the "Board will not engage in de novo review of findings of fact determined by an immigration judge," *see* 8 C.F.R. § 1003.1(d)(3), the BIA did not follow its own standard. For example, the IJ found credible Yusupov's testimony that he watched the videos out of a general interest in his country and the conflicts in the area and that he believed the extremist views of Osama bin Laden were inconsistent with true Islamic beliefs. The IJ also found credible Yusupov's testimony that he quit his job and evaded the authorities because he feared deportation; when it became clear that his friends with similar fears were not deported immediately and were provided with an opportunity to present their claims, he came out of hiding. Further, the IJ found credible Yusupov's explanation that he did not provide his residential address to investigators because he did not want to cause trouble for his host in Virginia, not because he attempted to hide anything suspicious. However, when the BIA concluded that the presence of the videos and Yusupov's alleged evasion provided reasonable grounds to believe he is a danger, it did not appropriately defer to the IJ on these points.

In contrast, the BIA did not err in relying on established facts not taken into account by the IJ regarding Yusupov's manner of entry to the United States and his misdemeanor conviction. Under the standard for mixed questions of law and fact, the BIA was entitled to "weigh the

extent they illustrate that questions under the INA often involve multiple inquiries subject to varying review.

evidence in a manner different from that accorded by the [IJ]." *Matter of A-S-B-*, 24 I. & N. Dec. 493, 497 (BIA 2008); *see also Rotinsulu v. Mukasey*, 515 F.3d 68, 73 (1st Cir. 2008) (finding that the regulations were "not intended to restrict the BIA's powers of review, including its power to weigh and evaluate evidence introduced before the IJ"). Whether this court finds that substantial evidence supports the BIA's ultimate conclusion that there are reasonable grounds to believe Petitioners are a danger is a separate inquiry to which we now turn.

## C.  The Existence of Substantial Evidence

The Government urges this court to defer to the BIA's finding that there are reasonable grounds to regard Petitioners as a danger to the security of the United States.  The Government focuses on the Executive's power and expertise in the area of national security, and relies on recent Supreme Court precedent to support its position.  In *Holder v. Humanitarian Law Project (HLP)*, the Supreme Court acknowledged that "when it comes to collecting evidence and drawing factual inferences in [the area of national security and foreign relations], the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate."  130 S. Ct. 2705, 2727 (2010) (internal quotation and citation omitted).

We do not arrogate to ourselves knowledge and sources superior to that of the Government.  But neither should we take its statements as *ipse dixit*.  Its statements, like that of any party, must be supported by the record it makes.

In *HLP*, the Government substantiated its position regarding the operation of terrorist networks through Congressional history, factual documentation, expert testimony, and an affidavit from the United States Department of State.[15]  On the contrary, this court has little to

---

[15] In *HLP*, the plaintiffs argued that the criminal material support statute impermissibly regulated their speech because their support of designated foreign

19

which to defer in this case.  Neither the BIA nor the Government has provided the name of any potential terrorist organization or extremist movement with which they claim Petitioners are affiliated nor did either provide a "coherent and reliable narrative" connecting Petitioners' seemingly innocuous actions and circumstances with any particular harm that Petitioners pose to the United States.  *Malkandi v. Holder*, 576 F.3d 906, 916 (9th Cir. 2009).  Without some hard information, this court is left guessing.  It is significant that even the State Department has declined to offer any opinion about the dangerousness of the Petitioners.

During the course of these proceedings, the State Department issued letters to the immigration court concerning Petitioners' applications.  The Department explained that issuance of the extradition requests is consistent with the Uzbek Government's practice of using broad provisions in its Criminal Code against political opponents for non-terrorism-related activities.  The Department declined to offer a position with respect to Petitioners' applications, stating it "has no evidence connecting [Yusupov or Samadov] to acts of terrorism.  The information available does not allow the Department to make a judgment as to whether [Petitioners] otherwise present[] a threat to the national security of the United States."  Y.Br.App. at 45, S.App. at 2170.  As the Supreme Court stated in *HLP*, "concerns of national security and foreign relations do not warrant abdication of the judicial role."  130 S. Ct. at 2727.

On remand, this court clearly instructed the BIA to ascertain whether reasonable, substantial, and probative evidence in the whole record reveals "reasonable grounds to believe" Petitioners "actually pose a danger" to the United

---

terrorist organizations affiliated with the Tamil struggle for independence in Sri Lanka would not further the terrorist activities of the organizations.  The Government countered that terrorist organizations do not meaningfully segregate support for their legitimate activities from the nefarious.  *Id*. at 2722-24.  We have no reason to disagree with the Government.

States – "a more certain determination" than whether they may or could be. *Yusupov I*, 518 F.3d at 201-02. The BIA failed to follow this court's mandate when it issued substantially similar opinions pre- and post-remand. We recognize that the BIA "is not required to write an exegesis on every contention;" however, it must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Filja v. Gonzales*, 447 F.3d 241, 256 (3d Cir. 2006) (internal quotation omitted). A formulaic recitation of our instructions simply does not suffice. *See Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2003) (en banc) ("[T]he soundness of the basis of the decision-making, even if experiential or logical in nature, must be apparent.").

The closest the BIA comes to identifying a particular threat posed by Petitioners involves their alleged support of Muslim extremists, to wit terrorists, in Uzbekistan based on the politically motivated Uzbek extradition requests and Interpol warrants.[16] *See In re Yusupov*, No. A 79-729-905, at 3-4 (BIA Dec. June 18, 2009) (the evidence "shows a fair probability that [Yusupov] supports and assists terrorist activity"); *In re Samadov*, No. A 79-729-711, at 4 (BIA Dec. June 18, 2009) (the Government met its burden of

_____

[16] Under 8 U.S.C. § 1231(b)(3)(B)(iv), there are two ways to determine whether an alien is ineligible for withholding as a threat to national security. First, the agency may find the alien has been involved in terrorist activities or is a member of or associated with a terrorist organization as described 8 U.S.C. § 1227(a)(4)(B), which automatically renders the alien a danger. Second, the agency may simply find that there are reasonable grounds to believe the individual is a danger to national security (i.e. defense, foreign relations, or economic interests). There is little guidance in the statute or subsequent interpretations as to the circumstances, other than involvement in terrorist activity or membership, that would render the alien a danger. Indeed, it appears that the BIA rested its conclusions on a terrorism theory even though the Government did not charge Petitioners as such.

establishing reasonable grounds that Samadov is a security danger "by supporting or assisting terrorism inspired by Muslim extremists").

It appears that the principal basis for the BIA's finding that Petitioners are a danger to the United States stems from the extradition requests and Interpol warrants issued by the Uzbek Government. Yet the BIA could not find that both IJs were clearly erroneous in their findings that the extradition requests and Interpol warrants were politically motivated and based on Petitioners' peaceful, religious beliefs. Even giving full deference to the BIA, we conclude that there is no credible evidence in the record to support the BIA's conclusion. On the contrary, there is overwhelming evidence that Article 244 of the Uzbek Criminal Code, upon which the Uzbekistan charges are based, is used by that government as a pretext to single out and punish those in peaceful opposition to the authoritarian regime. Y.Br.App. at 45, S.App. at 2110 (letter from State Department referring, inter alia, to Uzbek Government's practice of using "broad provisions in [its] Criminal Code . . . against its political opponents" for non-terrorism-related activities).

Olexa (who testified on behalf of the Government at Petitioners' removal hearings, emphasized the extradition requests and the Interpol warrants in support of a finding that Petitioners were dangerous) apparently had no direct knowledge about the situation in Uzbekistan, and offered no information as to Petitioners' role in any alleged terrorist activity in Uzbekistan.[17] It would lead to a perverse outcome

---

[17] The Senior Researcher on Central Asia for Human Rights Watch, Acacia Shields, testified at Samadov's hearing before the IJ that she does not know of "any Muslim groups [who favor the overthrow of the government] in the territory of Uzbekistan." S.App. at 2374. She testified that the Islamic Movement of Uzbekistan ("IMU") "was based in Afghanistan," and did engage in acts of violence, but she had not seen "any evidence" that the group still exists. *Id.* The IMU is on the current list of foreign terrorist organizations

were we to allow reliance on the fundamentally questionable extradition requests and Interpol warrants. How can the BIA on one hand assert that the Uzbekistan charges are pretextual and provide grounds for the United States to protect Petitioners under the CAT while at the same time credit the very same allegations to find Petitioners are a danger to this country? The BIA's reliance on these documents is even more problematic because, as we noted in *Yusupov I*, the information therein was apparently obtained by torture. *See Yusupov I*, 518 F.3d at 191-92 n.9; *see also Boumediene v. Bush*, 476 F.3d 981, 1006 (D.C. Cir. 2007) ("Testimony procured by coercion is notoriously unreliable and unspeakably inhumane."); *Abdah v. Obama*, 709 F. Supp. 2d 25, 28 n.3 (D.D.C. 2010) ("statements that are the product of torture are unreliable"); *cf. Costello v. United States*, 365 U.S. 265, 280 (1961) (in a criminal case, "the fruit of the poisonous tree doctrine excludes evidence obtained from or as a consequence of lawless official acts") (internal quotation omitted). It follows that the documents relied on by the BIA are not probative as a matter of law.

Even if there were some basis for the charges in the extradition request, "[t]errorist activity that is directed at another country does not invariably or necessarily involve a danger to the security of the United States." *Hosseini v. Gonzales*, 471 F.3d 953, 958 (9th Cir. 2006). *See also Cheema v. Ashcroft*, 383 F.3d 848, 858 (9th Cir. 2004) ("it does not follow that an organization that might be a danger to one nation is necessarily a danger to the security of the United States"). The relevant statute and regulations adopted by the United States are based on an underlying assumption that aliens frequently seek protection from their own countries that regard them to be dangerous, usually because of their opposition to the government in power. If we were to allow

designated as such by the United States under INA § 219. Foreign Terrorist Organizations, U.S. Dept. of State (Nov. 24, 2010), http://www.state.gov/s/ct/rls/other/des/ 123085.htm. It is undisputed that Petitioners have no affiliation with the IMU.

23

the BIA's decisions to stand, it would run counter to this country's strong tradition of granting protection to individuals sought by authoritarian regimes based on politically motivated charges.[18]

The additional bases given by the BIA for its finding that Petitioners are dangerous is based on evidence that is impermissibly speculative. Samadov argues persuasively that the legal standard requiring "reasonable grounds to believe" Petitioners are dangerous cannot be met without presentation of evidence satisfying probable cause. Guilt by association does not suffice. *See Scales v. United States*, 367 U.S. 203, 224 (1961) ("In our jurisprudence guilt is personal . . . ."); *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006) (probable cause "must be . . . particularized with respect to that person") (internal quotation omitted).

Part of the BIA's rationale for its conclusion that Petitioners pose a danger to the United States lies in their association with, inter alia, Zakirov. Samadov argues that the BIA's rationale of guilt by association presents serious due process concerns which we must avoid. He states that we can do so by imposing a "firm substantive requirement limiting the application of the national security exception to cases in which sufficient probative evidence establishes that an individual is engaged in actual dangerous conduct, or otherwise meaningfully associated with avowedly dangerous organizations or countries."[19] Samadov's Br. at 39-40. As

---

[18] There is extensive evidence in the record on the nature of the Uzbek regime. According to Human Rights Watch testimony before the House of Representatives Committee on International Relations, "Uzbekistan cannot be a good ally for the United States in the struggle against terrorism unless it stops persecuting Muslims for the peaceful expression of their faith." S.App. at 3171-72.

[19] The Fifth Amendment entitles non-citizens to due process of law in, inter alia, deportation proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993).

24

Samadov points out, this limiting principle finds its roots in Supreme Court jurisprudence requiring conduct or meaningful association in the application of immigration statutes to suspected Communist Party members in the middle of the last century. *See, e.g.*, *Gastelum-Quinones v. Kennedy*, 374 U.S. 469, 479-80 (1963) (holding mere membership in Communist Party was insufficient to meet threshold requirement of "meaningful association" required for deportation); *Rowoldt v. Perfetto*, 355 U.S. 115, 120 (1957) (reversing BIA deportation order because active, dues-paying Community Party member who worked at "an official outlet for communist literature" did not constitute meaningful association to warrant deportation); *Bridges v. Wixon*, 326 U.S. 135, 145-46 (1945) ("course of conduct which reveals cooperation with Communist groups for the attainment of wholly lawful objectives" does not constitute "affiliation" as defined by INA).

This reading is also consistent with contemporary cases applying the national security exception that stand in sharp contrast to the instant case.[20] In *Malkandi v. Holder*, 576 F.3d 906 (9th Cir. 2009), for example, the Ninth Circuit found that substantial evidence supported the BIA's finding that an Iraqi Kurd is a danger to national security. There, the court found that Malkandi served as a "travel facilitator" for a notorious al-Qaeda operative who was involved in attacks against United States interests overseas. *Id*. at 908. As the court stated, the facts found by the BIA "connect[ed] the dots" between a known terrorist from the Middle East, a Yemeni go between, and Malkandi. *Id*. at 915. The plot was substantiated by the Government's expert witness as well as specific 9/11 Commission findings and FBI interrogations of

---

[20] Courts have even rejected the Government's authority to detain "enemy combatants" at Guantanamo Bay based on mere speculation or guilt by association. *See, e.g., Al Mutairi v. United States*, 644 F. Supp. 2d 78, 82 (D.D.C. 2009) (rejecting charge as speculative); *Ahmed v. Obama*, 613 F. Supp. 2d 51, 65 (D.D.C. 2009) (rejecting charge as associational).

the operative.  *Id*. at 910-11, 915.  Moreover, the court found altogether implausible Malkandi's innocent explanations for the charged conduct.  It found that his pattern of misrepresentations with the immigration authorities under oath "discredited his portrayal of himself as an innocent participant." *Id*. at 917.  *Cf. Matter of U-H-*, 23 I. & N. Dec. 355, 356 (BIA 2002) (finding reasonable grounds to believe Iranian national is a danger to national security because he is a member of the Mujahedin-e Khalq ("MEK"), a designated foreign terrorist organization under INA § 219).

In contrast to its holding in *Malkandi*, in *Cheema* the Ninth Circuit reversed the BIA's finding of dangerousness in part because "no evidence supplies a link" between the applicants' alleged donations and "any specific organization, let alone . . . militant organizations."  383 F.3d at 856.  *Cf. Daneshvar v. Ashcroft*, 355 F.3d 615, 628 (6th Cir. 2004) (reversing BIA's order where government failed to establish individual engaged in violent acts or that he knew or reasonably should have known of terrorist organization's activities).

The INA also contains a related bar to the grant of asylum and withholding to individuals who have persecuted others on account of one of the protected grounds.  *See* 8 U.S.C. § 1231(b)(3)(B)(i).  As the Second Circuit noted, "courts must be cautious before permitting generalities or attenuated links" when applying the bar for persecution of others because the aliens have established that they will likely be persecuted upon return to their country.  *Xu Sheng Gao*, 500 F.3d at 98.  *See also Diaz-Zanatta v. Holder* 558 F.3d 450, 455 (6th Cir. 2009) ("the alien must have done more than simply associate with persecutors; there must have been some nexus between the alien's actions and the persecution of others"); *Singh v. Gonzales*, 417 F.3d 736, 739 (7th Cir. 2005) (requiring a showing of "genuine assistance in persecution" rather than an "inconsequential association").  The same concerns motivate our decision here.

The record does not provide substantial, if any, evidence that Petitioners engaged in conduct that was

dangerous, or were planning as much, or meaningfully associated with organizations or countries inimical to the United States, terrorist or otherwise. Although a probable cause requirement does not require more probable than not proof, it does require more than mere suspicion. It is established when "the facts and circumstances within the [Government's] knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by [Petitioners]." *Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010) (internal quotation omitted). In analyzing whether probable cause exists, we take a totality of the circumstances approach. *Id*. We therefore proceed to consider each remaining ground given by the BIA.

*Computer Materials*: The BIA accorded evidentiary significance to videos on the computer shared by the occupants of Petitioners' apartment and to an email sent, not to either Petitioner, but to someone else living in the apartment. These materials either viewed individually or with the record as a whole do not meet the probable cause standard.[21] With respect to the videos, the BIA made significant prejudicial errors regarding the contents.[22] The record does not support the BIA's contention that Ayman za-Zawahiri, Osama bin Laden's deputy, appeared in any of the videos much less that he was giving a "speech." The BIA also characterizes the video of Chechen rebel leader Shamil Basayev as a "speech," whereas the record refers to it as an

---

[21] Petitioners testified that they never saw the Pennsylvania Police facilities map and the Government presents no evidence to the contrary. Even if they had viewed it, the BIA has provided no explanation for how this publicly available map in any way demonstrates Petitioners are a danger. This court can only presume that is because there is none.

[22] Because Olexa, the Government's expert, does not speak the language contained in the videos, he was unable to provide detailed descriptions of what was said, and there was no translation provided.

"interview." Y.App. at 364, S.App. at 1949. Further, the BIA described one clip as "appear[ing] to show how to wire a roadside bomb." *In re Samadov*, No. A 79-729-711, at 2 (BIA Dec. June 18, 2009). However, Agent Olexa specifically testified that none of the videos were "training materials." Y.App. at 191. Moreover, contrary to the BIA's finding, several of the videos, including that of bin Laden, originated from Al Jazeera, a recognized news source.[23]

As discussed above, the BIA also failed to acknowledge that the IJ presiding over Yusupov's hearing found credible Yusupov's innocent explanations. To now find Yusupov's innocent explanations not credible, the BIA must point to evidence in the record that compels the conclusion that the IJ erred. 8 C.F.R. § 1003.1(d)(3)(i) ("Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous."). It has not done so. The IJ found that Yusupov understandably had a general interest in the activities occurring in his home country in the name of his religion and that he rejected the views espoused on the videos, as opposed to his own beliefs and understanding of Islam. Indeed, millions worldwide were glued to their television sets and computers in the wake of 9/11 in an attempt to understand the tragic events. The BIA has provided no plausible link between the act of watching these videos and any risk to this Nation's defense, foreign relations

---

[23] Yusupov testified that some of the videos came from the website, kavkazcenter.com. Y.App. at 206. Neither party presented evidence about the nature of this website yet the BIA characterizes it as "pro-extremist." *In re Yusupov*, No. A 79-729-905, at 3 (BIA Dec. June 18, 2009). This court takes judicial notice of the website that describes itself as "a Chechen internet agency which is independent, international and Islamic . . . . registered with the CRI Ministry of Justice." *About Kavkaz Center*, Kavkaz Center, http://kavkazcenter.com/eng/about/ (last visited May 19, 2011).

or economic interests.[24] This court also finds significant the IJ's finding, ignored by the BIA, that Yusupov did not intend to permanently download or archive the videos in any way.

Reliance on the videos to support a finding of Samadov's dangerousness is even more specious. A "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *Shields*, 458 F.3d at 277 (internal quotation omitted). The BIA impermissibly shifted the burden on the required showing with respect to national security to Samadov when it required that he corroborate his assertions that no evidence connected him to the activities of his roommate, Yusupov.[25] *See Malkandi*, 576 F.3d at 915 (noting that the burden only shifts to the alien to prove he is not a danger to national security once the Government has provided substantial evidence that he is). Even if Samadov happened to be present when Yusupov was watching the videos, inadvertent viewing does not constitute evidence of affirmative, nefarious activity. *Cf. Shields*, 458 F.3d at 279 (active registration with e-groups dedicated to trading child porn negated inference that defendant stumbled upon the sites never to return).

---

[24] As IJ Durling noted, the situation in Chechnya referred to in some of the videos "is quite complex and selected depictions from computer video files is woefully inadequate to form even a basic understanding of that long-simmering conflict." *In re Yusupov*, No. A79-729-905, at 7 n.11 (IJ Dec. Nov. 19, 2004).

[25] At oral argument, the Government argued that Yusupov's testimony demonstrates that Samadov watched the videos. However, Yusupov's testimony was not presented to the immigration court in Samadov's case. In any event, this testimony is hardly affirmative evidence that Samadov, lumped together with the "whole world," watched any videos, let alone the specific videos in question. Y.App. at 209-10.

The Government did not present evidence that either Petitioner ever saw the email referring to "jihad" on the computer. Moreover, the email is vague, see *supra* note 4, and the BIA, relying on stereotype and speculation failed to consider alternative meanings presented by Petitioners. In *Yusupov I*, we instructed the BIA on remand to consider the weight of Petitioners' evidence that there are alternative meanings to the word "jihad." In addition to violent holy war, which is the commonly used meaning of jihad, other meanings proffered on the record include "from an inward spiritual struggle to attain perfect faith to an outward material struggle to promote justice and the Islamic social system." *Yusupov I*, 518 F.3d at 191 n.7 (internal quotation omitted). Petitioners' consistent testimony, corroborated by country conditions evidence, was that they identify as Independent Muslims who follow a peaceful practice.

In short, "in spite of the number of years" Petitioners have been present in this country, their computer "did not produce any direct or causal link suggesting that [they] espoused violence, such as email messages of a questionable nature." *In re Yusupov*, No. A 79-729-905, at 6 (IJ Dec. Nov. 19, 2004).

*Manner of Entry*: Once again, we are unanimous that the BIA's finding that Petitioners' manner of entry supports a finding of dangerousness is not supported by substantial evidence. Samadov entered on a student visa with Zakirov and attended a four week program.[26] Yusupov also entered on a student visa several months later but unlike his former roommates, never attended school. Y.App. at 109-10. Petitioners testified that they did not follow through with their

---

[26] The Government asserts that Samadov only attended two weeks of school in contrast to Samadov's testimony that he attended four weeks of school, as originally planned, and then stopped for financial reasons and thereafter sought work. S.App. at 2297. The IJ stated that Samadov and Zakirov "spent four weeks studying English as a second language." S.App. at 2215.

education for financial reasons. Y.App. at 109-10, 129, S.App. at 2297. This explanation is not inherently suspect and cannot substitute for affirmative evidence of dangerousness.[27] *See Hosseini*, 471 F.3d at 958 (reversing denial of withholding of petitioner who overstayed student visa, because BIA "made no finding, and cited no evidence, of any reason other than terrorist activity [abroad] why Hosseini is a danger to the security of the United States").

The Government makes passing reference in its briefs to its suspicion based on the timing of Petitioners' entries to the United States as just after a bombing in Uzbekistan in 1999. However, it makes no attempt to "connect[ ] the dots" between this event and any actual evidence implicating Petitioners. *Malkandi*, 576 F.3d at 915. Petitioners have submitted evidence that the Uzbek Government itself was implicated in the 1999 bombings and used the events to crack down on opponents of its regime. Y.App. at 788, S.App. at 930.[28]

*Alleged evasion of the authorities*: The BIA's finding that Yusupov and Zakirov sought to evade detection by the authorities in the United States through interstate and international flight mischaracterizes the record and fails to acknowledge the plausible explanations provided by

---

[27] The Government directs us to the Congressional reports of the 9/11 Commission to support its contention that the manner of entry is suspect. Yet, the Government admits that this report does not establish any facts pertaining to Petitioners in particular. *See* Appellee's Br. in *Yusupov v. Att'y Gen.* at 41; Appellee's Br. in *Samadov v. Att'y Gen.* at 53. We cannot draw conclusions regarding Petitioners from this report.

[28] We recognize that some of the Government's suspicions may stem from the fact that some of the aliens responsible for the 9/11 bombings entered this country on student visas, but we know of no basis to attribute the same terroristic intent to all foreign student visa holders.

31

Petitioners. Although Zakirov left the United States before the Government had a chance to file a motion to reopen with the new evidence found on the roommates' shared computer, there is nothing in the record to suggest that the Government or the BIA has attempted to rescind the grant of withholding of removal. *See In re Zakirov*, No. A 79-729-712 (BIA Dec. Sept. 21, 2004). Petitioners contend that Zakirov traveled openly to Canada after being granted withholding of removal and the Government presents no evidence in contradiction. Indeed, at that time, nothing prevented Zakirov from seeking asylum, a more permanent form of relief, in Canada after his proceedings in the United States were final.[29] In any event, the BIA does not explain why it paints Petitioners with Zakirov's brush.

Yusupov testified that he moved to Virginia after being granted withholding of removal, not in an attempt to evade the authorities. However, after he learned that the Government reopened Samadov's case and incarcerated him, Yusupov quit his job to avoid detection because he feared deportation to Uzbekistan where he believed he would be tortured. Y.App. at 149. As soon as Yusupov learned that the Government was not going to deport his friends, he returned to his Virginia job and cooperated with subsequent investigations. Y.App. at 150. The BIA has not explained why it did not take this alternate, credible explanation into account. *See Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 425 (3d Cir. 2005) (unexplained decision not supported by substantial evidence where contrary to testimony).

---

[29] A subsequent agreement between the United States and Canada prevents Canada from adjudicating an application for asylum already decided upon in the United States and vice versa. However, this rule would not apply to Zakirov who appears to have entered Canada prior to December 29, 2004 when the agreement became effective. *See* Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, U.S.-Can., Dec. 5, 2002, Can. T.S. No. 2.

There is no evidence that Samadov sought to evade detection. Any purportedly suspicious activities undertaken by Samadov's friends are, as a matter of law, insufficient to establish individualized suspicion against him. This is particularly applicable here, as the three individuals were no longer living together. The Government speculates that Samadov did not flee because "it would have been more difficult for him to do so—and perhaps in his mind, less necessary—because he had married an American citizen." Appellee's Br. at 51 n.19. No evidence supports this speculation. Moreover, "where a factor and its opposite can both be used" to support a finding of reasonable suspicion, here flight or no flight, "the court should not give weight to either factor." *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1446-67 (9th Cir. 1994).

*Yusupov's Misdemeanor Conviction*: The BIA has failed to explain how Yusupov's misdemeanor conviction for misrepresenting his nationality in an attempt to obtain employment provides any connection to his asserted dangerousness.[30] The IJ in Yusupov's hearing and the BIA found Yusupov's testimony to be credible regarding the heart of his claims (the prior standard) and there is no evidence that claiming citizenship to obtain employment indicates he is a danger. This is not unusual behavior, albeit undesirable and unlawful, for the tens of thousands of economic migrants and

---

[30] The Government makes some attempt to connect his behavior seeking a job by claiming that instead of enrolling in language school, Yusupov earned money and sent it "to the families of criminals in Uzbekistan." Appellee's Br. at 41. This argument distorts the record – Yusupov testified that he sent the money to other Independent Muslims like himself targeted by the Uzbek authorities. Because the BIA did not rely on it, it merits little, if any, weight.

33

refugees who enter our borders each year and does not here support a finding of probable cause.[31]

*Samadov's adverse credibility determination*:  The charge emphasized most vehemently by the BIA and the Government stems from the adverse credibility finding made by the IJ.  Samadov argues that finding is clearly erroneous, is not material to any of the Government's allegations that he is a danger and, even if upheld, cannot be used to undermine Samadov's other testimony.  It is, however, our responsibility to examine the record scrupulously in this connection.

Like factual findings, "adverse credibility determinations are reviewed for substantial evidence." *Balasubramanrim v. I.N.S.*, 143 F.3d 157, 161 (3d Cir. 1998). As such, "adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible."  *Dia*, 353 F.3d at 249 (internal quotation omitted).

Notably, at Samadov's first hearing, IJ Sease found his testimony regarding his activities in Uzbekistan and the origin of the extradition request to be "extremely credible."  S.App. at 46.  In the reopened proceedings, the same IJ without recanting her earlier findings, found Samadov's account of some aspects of his life in Philadelphia to be not credible.  *In re Samadov*, No. A 79-729-711, at 9-10 (IJ Dec. Aug. 2, 2005).  The IJ based her latest adverse credibility finding on the following: (1) Samadov did not know every guest who stayed at the communal home rented in his name in Philadelphia; (2) Samadov was not familiar with everything stored on the computer he shared with his roommates; and (3)

---

[31] This court also finds significant that in January 2007, a district court in the Middle District of Pennsylvania found that special circumstances (e.g. adverse foreign policy consequences or anti-terrorism concerns) did not warrant Yusupov's continued detention. *Yusupov v. Lowe*, No. 4:06-CV-1804 (M.D. Pa. Jan. 12, 2007).  The Government did not even argue that special circumstances existed in that case.

Samadov did not mention that he wired $3,000 to his brother in Uzbekistan when he was initially questioned by the Government about money sent home.

No record evidence supports the IJ's first contention that it was implausible that Samadov did not know everyone who was living in his house. Samadov was never asked to provide the occupants' names and never testified that he lacked this knowledge. Rather, Samadov testified to the transient nature of the house and testified that anywhere from six to eight men lived there at any given time. The Government conceded at oral argument that this was a "peculiar finding" by the IJ that does not support the adverse credibility determination. Tr. of Oral Arg. at 58.

The IJ's second contention is based on pure conjecture and similarly cannot support a lack of credibility on the part of Samadov. *Dia*, 353 F.3d at 249-50. Samadov testified that he never saw the materials found on the computer and that he rarely used the computer because it was frequently in use by others in the house and he spent little time at home given his work schedule. S.App. at 430. As we previously noted, the Government presented no evidence to the contrary. Indeed, as Samadov points out, the Government failed to inform the IJ that "Yusupov had admitted that he was the one who found the videoclips on the internet, and that in the course of viewing they were cached – not downloaded, as the BIA claimed – on the computer without his knowledge." AALDEF Br. at 26. We see no basis in the record for the IJ's finding that Samadov must have known about the cached videoclips. That finding is impermissibly based on the IJ's assumption that Samadov would have been interested in the video contents because he is a Muslim.

Finally, we examine the record for any support for the IJ's determination that Samadov's testimony concerning the wire transfer to his brother is suspect. The Government argues that Samadov could not have honestly forgotten sending $3,000 to his brother five years prior to the hearing. Samadov counters that when he was first questioned about sending money to Uzbekistan, the questioning was focused on

35

charitable contributions[32] and because he regarded the payment to his brother as a repayment of a debt obligation, he

---

[32] For example,

Q. Sir, they say that you've have sent money back to Uzbekistan to fellow followers of Iman Nazarov, have you not?

A. No.

Q. No? Who have you sent money to (indiscernible)?

A. I sent to people there poor and needy people.

Q. And how did you learn the identities of the poor and needy people who needed money?

A. How I?

Q. Yes, how did you know who to send the money to?

A. Because I give my friends with a person who's in charge of they give that person people. They are responsible to give that charity to those people.

Q. How much money do you think you've sent back to Uzbekistan since you've been here in the United States?

A. Maybe $200.

Q. Two hundred dollars total?

A. Yes. Yes.

Q. That's your best recollection?

A. Yes.

Q. In what sort of increments of money have you sent there?

A. I don't understand the question increments?

Q. You sent $200 once and that's it or did you send $10 one day, $10 another - -

A. Twenty dollars, thirty dollars, whenever I feel give charity when I hear about somebody needs because so many families back there their husbands, their fathers in jail, their wives don't work, their kids are starving.

Q. Well, who is communicating these needs to you?

A. We have Muslim brothers in my country.

Q. And how would they communicate to you about their need for money?

A. Well, they can my friends call, they call or when I call my brother I found out about it. I send money for my relatives where ever I ask my brother this person is alright? This neighbor is alright? Because sometimes I call, my brother says, my mom says listen to my neighbors take in to custody, the kids are starving. Then I say, I'm not going to eat food here (indiscernible)

37

did not think it was relevant. *See* AALDEF Br. at 28 ("many Muslims draw a stark distinction between the concepts of debt and charity").

Samadov argues that a review of the transcript makes clear that he did not intend to mislead the factfinder. When Samadov sought to explain his testimony, the IJ denied him the opportunity to clarify his responses. S.App. at 440-41. *See Caushi v. Att'y Gen.*, 436 F.3d 220, 226 (3d Cir. 2006) (citing *Campos-Sanchez v. I.N.S.*, 164 F.3d 448, 450 (9th Cir. 1999) (requiring the BIA to consider applicant's explanations for inconsistencies before making a credibility determination)); *Don v. Gonzales*, 476 F.3d 738, 741 (9th Cir. 2007) (IJ must "provide a petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis of a denial of" relief) (internal quotation omitted).

The Government's argument that Samadov only admitted to transferring money to his brother because the Government confronted him is belied by the record.[33]

---

they are starving there. And that's what my religion teaches me.

    Q.    And you're sure that it wouldn't be more than $200 (indiscernible)?

    A.    Yes, yes, sure.

S.App. at 425-426.

[33] An examination of the testimony bears this out. After a break of a few weeks, the hearing resumed and the Government lawyer focused on what he regarded as the inconsistency in Samadov's testimony, stating:

And now we have bank records that show, that in fact, in June of 2000 he wired a substantial sum of money, apparently to

his brother. Some $3,000 and Mr. Arlow gave a copy to me before the hearing. I don't know whether he's intending to submit it into evidence, I believe he just received it yesterday, that is a I believe is a handwritten fax from the respondent's brother confirming that he received $3,000 in June of 2000 from his brother.

S.App. at 447. Samadov was then recalled:

JUDGE TO [SAMADOV'S LAWYER]

Q.      Mr. Arlow, you certainly have the right to question your client as well, but I believe that the Government has asked to recall you and I certainly want to know, want some explanations between what you previously said and the bank records that the Government has supplied.

A.      May it please the court, we also agree that the money was transferred. It's not just that they're bank records. It's acknowledgement of receipt. There's not a question that the money was transferred.

. . .

[GOVERNMENT LAWYER] TO MR. SAMADOV

Q.      Mr. Samadov, did you send approximately $3,000 U.S. dollars to someone in Uzbekistan about June 20th, 2000?

A.      Yes, I did send (indiscernible) I send to my brother. Like I said in my court, last previously court date, --

39

JUDGE TO MR. SAMADOV

Q.	The answer is yes or no, sir.

MR. SAMADOV TO [GOVERNMENT LAWYER]

Q.	Yes, to my brother, not to someone

A.	Okay.

Q.	And how did you do that?

A.	Yes, I wired the money. It was my (indiscernible) pay.

Q.	And how did you wire the money?

A.	My account.

. . .

Q.	And, how long did it take you to save up that money?

A.	A year and a half.

Q.	Okay. And this was as you said, your first priority was paying him back, right?

A.	Yes.

Q.	Because it had been a big hardship to him to help you out?

40

Samadov testified that he telephoned his brother to help him remember the amount of debt he repaid before the hearing. At the continued hearing, Samadov produced a letter from his

A.     Exactly.  He had bankruptcy so I knew that –

Q.     And you must've felt good that you were paying him back and helping him out?

A.     I'm not helping out, it's just whatever my debt.  It's nothing extra.

Q.     Right.  All right.  But you were glad that you were able to fulfill your debt.

A.     Of course, you know, as a brother.

Q.     Had you forgotten all of this last time we had a hearing here and I asked you whether you had ever wired any money to Uzbekistan?

A.     Yes, because it was debt.  It was nothing extra.  That's why I can't see, as like I said, I want to make very clear.  In my previous court hearing, I said your question and the Judge also ask, did you, I said I don't remember.  Like you said, but if I did, I said I did send to my brother.  You ask was it Isroil Samadov, I said who was that person.  I said Isroil Samadov.  If I (indiscernible) say I sent to my brother.  You ask who was it.  It's on the record and I said Isroil Samadov.  I spell the name very clear.

S.App. at 450-454.

41

brother, and on his own accord, provided an explanation for the discrepancy that arose in the prior hearing. S.App. at 560.

Regardless, this discrepancy does not go to the heart of Samadov's claims and, as such, cannot support an adverse credibility determination. *Berishaj v. Ashcroft*, 378 F.3d 314, 323 (3d Cir. 2004).[34] The Government presented no evidence and the IJ made no finding that this $3,000 supports a finding of danger by Samadov to the United States. The IJ made no finding that the $3,000 went to finance terrorist or extremist activities, or that Samadov had any motive to lie or hide other transfers.[35] *See Muhanna v. Gonzales*, 399 F.3d 582, 590 (3d Cir. 2005) ("one adverse credibility determination does not beget another . . . an IJ must justify each credibility finding with statements or record evidence specifically related to the issue under consideration") (internal quotation omitted). This is not surprising because, as the Government admitted at oral argument, "[t]here is no direct evidence." Tr. of Oral Arg. at 67. The only reliable evidence is a letter from Samadov's brother confirming that the money was sent to repay a debt. S.App. at 560. Other than the $3,000, Samadov testified that he sent about $200 cash to needy families, testimony the Government does not dispute. *Cf. In re R-S-H-*, 23 I. & N. Dec. 629, 641 (BIA 2003) (upholding adverse credibility finding where respondent's testimony was directly related to whether he was aware of the terrorist-linked activities of an organization, despite his role therein).

---

[34] Because Samadov filed his asylum application before May 11, 2005, the pre-REAL ID Act standard applies. *Chukwu v. Att'y Gen.*, 484 F.3d 185, 189 (3d Cir. 2007).

[35] The Government half-heartedly attempts to link this transfer of cash with potential support for bombings that occurred in Uzbekistan in 2004. Appellee's Br. at 44 n.15. However, the $3,000 was wired to Samadov's brother in June 2000 and there is nothing in the record linking this cash or his brother to any such activities. In fact, Samadov was in Government custody at the time of the bombing and in the months before.

The IJ also noted that she took into account Samadov's "demeanor, candor, [and] responsiveness." *In re Samadov*, No. A 79-729-711, at 9 (IJ Dec. Aug. 2, 2005). However, the IJ did not explain why these factors demonstrated that all of Samadov's testimony was incredible and the IJ's holding deserves no deference.[36] *See Dia*, 353 F.3d at 252, 275 (McKee, J., concurring) ("resting factual conclusions upon unexplained and unarticulated demeanor poses an even greater risk of biased fact finding that can deny a petitioner due process"). Accordingly, we find no evidence to support the IJ's finding, adopted by the BIA, that Samadov's testimony was not credible.

Neither the IJ nor the BIA made any affirmative finding that the testimony it deemed incredible implicates national security. Substantial evidence is required to link the associations and activities of Yusupov and Samadov with one of the criteria relating to the security of the United States. The Government, "[w]ith the extensive resources of the Executive Branch, including the resources of the Departments of Defense, State, Justice, Treasury and others . . . is in a unique position to provide such evidence." *Cheema*, 383 F.3d at 857. The Government has not so done. The evidence viewed as a whole not only supports a conclusion contrary to the BIA, but compels it. *See Abdille v. Ashcroft*, 242 F.3d 477, 484 (3d Cir. 2001).

---

[36] The Government argues that "Samadov was frequently uncooperative and belligerent, and had to repeatedly be instructed to answer the questions that were posed to him, and not be argumentative." Appellee's Br. at 48. The Government mischaracterizes the record and misinterprets what appears to be Samadov's confusion, not unexpected given frequent language and cultural barriers in immigration proceedings.

# IV.

## Conclusion

As we have set forth in some detail, we conclude that the BIA's determination that Petitioners Yusupov and Samadov present an actual and present danger to the United States is not supported by substantial evidence. We are acutely cognizant that, in most respects, Congress has delegated issues of national security with respect to aliens to the agencies that deal with immigration, most particularly to the Board of Immigration Appeals. We recognize that the BIA is in a position of knowledge superior to that of the federal courts. Nonetheless, we retain our historic, indeed constitutional authority, to review executive agencies' determinations, giving their determinations due deference. In that vein, we do not decide that Petitioners do not present a danger to this country's security; we merely decide that the Government has not proven that they are!

Ordinarily, the "proper course . . . is for an appellate court to remand to the agency for additional investigation or explanation." *Kang v. Att'y Gen.*, 611 F.3d 157, 168 (3d Cir. 2010) (internal quotation and brackets omitted). However, in rare circumstances "where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration." *Id.* (internal quotation and brackets omitted). This is such a case.

There is no dispute that Petitioners would be persecuted and tortured on religious and political grounds if returned to Uzbekistan. No amount of reconsideration by the BIA will change that. Where the BIA has twice considered the whole record and failed to support its conclusion that Petitioners are a danger to national security with substantial evidence, and where the Government represented at oral argument that there are no additional facts or evidence to link either individual to activities or groups adverse to United States interests, there is no reason to remand. *See, e.g., Zhu v. Gonzales*, 493 F.3d 588, 602 (5th Cir. 2007) ("[T]he BIA has

now had two opportunities to address the legal and factual issues that are again before this court; we need not give it a third bite at this apple.").

It follows that Yusupov and Samadov are entitled to mandatory withholding of removal as a matter of law.[37] *See I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). "When the outcome is clear as a matter of law . . . remand is not necessary." *Mahmood v. Gonzales*, 427 F.3d 248, 253 (3d Cir. 2005). Accordingly, we grant the petitions for review and direct the BIA to grant Petitioners' applications for withholding of removal.

---

[37] We deny Samadov's request that we overturn the agency's denial of asylum. This court lacks jurisdiction to do so. *See supra* note 10.