[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11910
Non-Argument Calendar
_____

Agency No. A209-908-615

WASIQ ULLAH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(January 31, 2019)

Before BRANCH, HULL and JULIE CARNES, Circuit Judges.

PER CURIAM:

Wasiq Ullah, a native and citizen of Afghanistan, petitions for review of the Board of Immigration Appeals's ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his claims for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). After review, we deny the petition for review.

## I. BACKGROUND FACTS

### A. Interpreter Work with U.S. Forces in Afghanistan

Between 2008 and 2011, Ullah's brother Amdadullah worked as a linguist at the U.S. Army Base Fenty in Afghanistan. As a result of his brother's employment, Ullah's family received warnings announced over a loudspeaker at their hometown mosque that they were in danger from the Taliban. In 2010, Ullah's family relocated to Jalalabad.

Between January 2011 and January 2014, Ullah worked as a linguist for the U.S. Army at Camp Leatherneck in Afghanistan. Camp Leatherneck was a trucking terminal that received and distributed supplies to security forces and Afghan citizens. Ullah worked as an interpreter for the camp's logistical units, speaking with local truck drivers and other Afghans.

In August 2011, after a security screening, Ullah's brother Amdadullah was terminated from his linguist position because of his involvement with Taliban sympathizers and his enabling of racism among the linguists on the base. As a

2

result, Ullah was designated a "tier 6" risk, which did not preclude his employment at Camp Leatherneck, but meant that Ullah was watched more closely. After his termination, Ullah's brother Amdadullah worked as a consultant for the Nangarhar Provincial Council. Ullah has two other brothers who are Afghan police officers. None of Ullah's brothers have ever been harmed in Afghanistan.

While working at Camp Leatherneck, Ullah received four certificates of appreciation. In 2012, Ullah began the process of applying for a special immigrant visa under § 602(b) of the Afghan Allies Protection Act of 2009, Pub. L. No. 111-8 (March 11, 2009), based on his service as an interpreter at Camp Leatherneck.[1] In August 2013, Ullah received a Chief of Mission letter that confirmed his eligibility to apply for a special immigrant visa, one of the required steps in the process.

## B.    Termination and Tier Four Security Risk Designation

On January 22, 2014, Ullah was terminated from his job at Camp Leatherneck because he failed a routine screening conducted by a counterintelligence officer. As part of the screening, Ullah underwent a polygraph test and received a negative result for his answers to two questions—whether he was a member of an anti-coalition group and whether he had ever participated in an attack against coalition forces.

---

[1]The special immigrant visa program is available to Afghan nationals who worked for or on behalf of U.S. forces and meet certain other requirements, including experiencing a serious threat as a consequence of their employment.

As a result, Ullah was barred from Camp Leatherneck and other U.S. installations in Afghanistan and from receiving U.S. training. In addition, the 2013 Chief of Mission letter confirming Ullah's eligibility to apply for a special immigrant status was revoked. In April 2014, Ullah was interviewed at the U.S. Embassy in Kabul in connection with his application for a special immigrant visa. Ultimately, Ullah was unable to complete the special immigrant visa process, however, because he no longer met the requirements for the requested classification once his Chief of Mission letter was revoked.

A counterintelligence officer subsequently prepared a memorandum indicating that after Ullah was terminated, he was placed on "tier four" of the Biometrics Enabled Watch List. Ullah's tier four designation meant he was considered a "moderate threat or risk to U.S. or coalition personnel" because he could provide information that could lead to action against U.S. forces. The memorandum stated that Ullah was suspected of affiliating with a foreign intelligence security service, such as the Taliban, which meant Ullah had some communications with a suspected foreign intelligence officer. The memorandum indicated Ullah could pose a "force protection threat," which meant he could have provided information that could be used to harm U.S. forces. While the memorandum itself was declassified so that it could be presented as evidence in Ullah's immigration proceedings, the information underlying the memorandum

4

was not.  The classified derogatory information about Ullah was based on more than Ullah's failed polygraph test and his termination at Camp Leatherneck.

## C.    Subsequent Years in Afghanistan

From June 2014 until September 2016, Ullah studied political science at Al Falah University in Jalalabad, commuting to the university by biking, walking, or riding in car.  While Ullah attended the university, some people around the university or in his neighborhood were kidnapped or killed by opposition groups.  According to Ullah, opposition forces such as the Taliban tried to kill people who cooperated with the Afghan government or who worked with U.S forces, including as interpreters.  To protect himself, Ullah kept secret his former work as an interpreter, remained mostly in his home, and did not attend social events or travel outside the city.  Ullah also received warnings from the Nangarhar Provincial Council that he was in danger because of his past work with U.S. forces.  However, neither Ullah nor his brother Amdadullah, who also had worked as a linguist for U.S. forces, was ever harmed in Afghanistan.

Before leaving Afghanistan, Ullah met with his brother Amdadullah in Kabul.  Amdadullah took a farewell photo of Ullah standing in a public park wearing western attire.  Amdadullah posted the photo on Facebook along with other photos of his family.

5

**D.**    **Entry into the United States and Removal Proceedings**

In late September 2016, Ullah left Afghanistan and paid $16,000 to be smuggled through several countries and into Mexico. After reaching Brownsville, Texas, Ullah applied for admission to the United States without a valid entry document. In a credible fear interview, Ullah stated that he feared persecution in Afghanistan because of his past interpreter work for the U.S. Army.

In removal proceedings, Ullah admitted that he was an immigrant applying for admission to the United States who did not possess a valid passport or other entry document and conceded his removability under Immigration and Nationality Act ("INA") § 212(a)(7)(A)(i)(1), 8 U.S.C. § 1182(a)(7)(A)(i)(1). Ullah applied for asylum, withholding of removal, and CAT relief, contending that he feared persecution by the Taliban and other insurgent groups based on his political opinion and membership in a particular social group.[2] Ullah submitted 2012 and 2013 letters from his supervisors at Camp Leatherneck recommending Ullah for a special immigrant visa and copies of the undated letters purportedly from government officials in Nangarhar stating that opponents of the Afghan government had threatened Ullah's life and the life of his family members.[3]

---

[2]Ullah also moved to terminate the removal proceedings based on his purported eligibility for a special immigrant visa. Ullah's petition for review does not challenge the denial of this motion, and we do not discuss it further.

[3]The only translations of these three letters in the record were prepared by Ullah and do not contain dates.

Ullah also filed country background exhibits, including the U.S State Department's 2015 Report on Human Rights Practices in Afghanistan ("country report"), which noted that insurgent groups made indiscriminate attacks on civilians and killed persons affiliated with the government. One 2017 New York Times article reported that a suicide bomber, who had worked at Bagram Air Base and had links to the Taliban, killed Afghan security guards working for a U.S military contractor on the base. Also, the military had reduced the number of Afghan workers at the base in part due to force protection concerns. Other 2017 New York Times articles noted Taliban attacks on Afghan police and security forces and reported Taliban or ISIS control of parts of Afghanistan. A 2013 Washington Post article about the State Department's administration of the special immigrant visa program included a report of a former Afghan interpreter for the U.S. Marines who was kidnapped and killed outside Kabul days after he had completed his visa interview. Additional articles described various political developments regarding the U.S. special immigrant visa program over the past several years, violence in Afghanistan, including fighting between pro- and anti-government forces and attacks on civilians, U.S. foreign policy and the bombing of ISIS militants, and government corruption in Afghanistan.

The government moved to pretermit the asylum and withholding of removal portions of Ullah's application based on statutory national security bars to these

forms of relief.  Under these statutes, an applicant is barred from relief if there are "reasonable grounds" to believe the applicant is a danger to the security of the United States.  See INA § 208(b)(2)(A)(iv), 8 U.S.C. § 1158(b)(2)(A)(iv) (asylum); INA § 241(b)(3)(B)(iv), 8 U.S.C. § 1231(b)(3)(B)(iv) (withholding of removal).

At Ullah's merits hearings, the government presented expert testimony from U.S. Army Colonel Paul Sarat, Jr. in support of its claim that the national security bars applied.  Colonel Sarat explained the special immigrant visas application process and the termination process for Afghan interpreters working with the military.  Colonel Sarat also testified about the military's documentation relating to Ullah's termination and tier-four risk designation.  Ullah testified in support of his claims for relief and stated that people in Afghanistan knew that he had worked for the U.S. Army and that he believed his life was in danger there.

## F.    IJ's Decision

The IJ issued a written decision denying Ullah all requested relief.  The IJ made the following relevant findings of fact: (1) Ullah was not a combat linguist during his employment as a contract interpreter for the U.S. military from 2011 to 2014; (2) Ullah was never threatened or harmed while working as an interpreter at Camp Leatherneck or when he left the base on leave; (3) Ullah was terminated after a routine periodic security screening at Camp Leatherneck and was suspected

8

of being affiliated with a foreign intelligence security service; (4) Ullah was barred from entering U.S. installations and receiving U.S. training provided to Afghan police or military forces; (5) Ullah applied for a special immigrant visa and received a Chief of Mission approval letter, but the approval was revoked after the nature of his termination was ascertained; (6) for two and a half years after his termination, Ullah attended a university that did not have security guards; (7) during that time, Ullah was not harmed or threatened; and (8) before Ullah left Afghanistan, Ullah's brother posted a picture on Facebook of Ullah in a public place wearing western garb.

In addition, the IJ found that the unauthenticated letters submitted by Ullah purportedly from the Nangarhar Provincial Council were fabricated based on inconsistencies and typos in the letters. The IJ also made an express finding that Ullah was not credible, finding Ullah's testimony was weak and uncorroborated by reliable evidence, Ullah's claim that he received threats over a loudspeaker was unbelievable, and Ullah was evasive and non-responsive during cross-examination.

The IJ concluded, inter alia, that the government had met its initial burden to show that the national security bars applied and that Ullah had not met his burden to show that they did not. See 8 C.F.R. § 1240.8(d) (providing that "[i]f the evidence indicates that one or more of the grounds for mandatory denial of the

9

application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply").

Alternatively, the IJ considered Ullah's claims on the merits. As to Ullah's asylum claim, the IJ acknowledged that Ullah must show "either that he would be singled out for persecution . . . or that, within that country, there is a pattern or practice of persecution, on account of a protected ground, of those similarly-situated to him and that he identifies with the group such that his fear is reasonable." The IJ concluded that Ullah had not established a well-founded fear of future persecution because "the record does not suggest that he has a well-founded fear of future persecution." The IJ pointed out that: (1) Ullah relied on fabricated documents; (2) his family members continued to live open lives as current Afghan government employees and had not been harmed; (3) Ullah attended university for two years and suffered no harm or threats of harm; and (4) Ullah never personally received any threats from anyone, let alone the Taliban.[4] The IJ also concluded that, because Ullah had not met the lower burden to show eligibility for asylum, he also had not met his burden to show eligibility for withholding of removal.

---

[4]The IJ elaborated upon its reasons for discrediting Ullah, but we do not include them because the BIA ultimately did not adopt the IJ's credibility finding.

The IJ determined that Ullah also was ineligible for CAT relief because he had lived for two years in Afghanistan without being harmed, as had his brother Amdadullah, who also had worked as a linguist.  The IJ acknowledged Ullah's evidence of "unrest in Afghanistan . . . at the hands of government opposition forces, including ISIS and the Taliban."  But the IJ concluded that Ullah's references to "vague statements in country reports," along with his unreliable testimony, were insufficient to show Ullah faced "a foreseeable, real, and personal danger of being subjected to torture by the Taliban or other government opposition forces."

## G.    Appeal to the BIA

Ullah appealed to the BIA, raising numerous issues, most of which are not reasserted in his petition for review filed in this Court.  Relevant here, Ullah challenged: (1) the IJ's determination that his asylum and withholding of removal claims were subject to national security bars; and (2) the IJ's alternative finding that Ullah had not shown a well-founded fear of future persecution.  As to the second issue, Ullah argued that he had demonstrated "his inclusion in a group of similarly situated persons who have worked as linguists for the U.S. military, who have experienced a pattern and practice of persecution on account of membership in that particular social group."

The BIA dismissed Ullah's appeal. The BIA concluded that the IJ had properly applied the national security bars.

The BIA also affirmed the IJ's alternative determination that Ullah did not demonstrate a well-founded fear of future persecution in Afghanistan due to his work as an interpreter. The BIA stressed that Ullah had never personally been threatened. The BIA noted that Ullah's family had been threatened over a loudspeaker at a mosque, but that this threat had occurred before Ullah's employment at Camp Leatherneck, and after his termination, Ullah had lived safely in Afghanistan for two years while attending university. The BIA noted that Ullah's family, all of whom were government supporters and some of whom were government employees, had never been harmed by the Taliban or other terrorist groups, including his brother who also worked as an interpreter for the U.S. military and now worked for a local government. In addition, Ullah's brother had posted pictures of himself and his family on Facebook, which indicated Ullah's brother did not fear that the Taliban would target him. The BIA stated that it "discern[ed] no clear error in the Immigration Judge's finding that the respondent did not have a well-founded fear of being targeted upon return to Afghanistan because of his past employment as an interpreter."

The BIA rejected Ullah's argument that the IJ "did not sufficiently consider the letters" from Nangahar provincial officials, noting that they were

unauthenticated and "insufficient to establish that [Ullah] has a well-founded fear of persecution in Afghanistan." The BIA determined that "[t]o the extent [Ullah] argues on appeal that the Immigration Judge did not consider his claim of pattern or practice of persecution, he does not point to any specific evidence that would satisfy his burden of proof." The BIA also explained that Ullah's country conditions evidence described generally "the fighting between U.S. forces and insurgent groups" and provided "some evidence that Afghans who work with the U.S. military are harmed" but did not "demonstrate, however, that persecution is sufficiently systemic or widespread" to establish "a pattern or practice of persecution against former interpreters for the U.S. military."

The BIA agreed with the IJ that, on the record before it, Ullah had not met his burden of establishing eligibility for asylum or the more stringent standard for withholding of removal. The BIA also agreed that Ullah had not shown it was more likely than not that Ullah would be tortured by terrorist groups or that the Afghan government would acquiesce to such torture.

## II. DISCUSSION

Ullah's petition for review challenges only the denial of his claims for asylum and withholding of removal based on his fear of future persecution on account of his membership in the particular social group of former U.S. military

13

interpreters.[5]  In addition, Ullah's petition for review explicitly waives his asylum and withholding of removal claims based on an individualized fear of persecution. Thus, Ullah's asylum and withholding of removal claims now rely solely on a pattern-or-practice theory of future persecution.

As to those future persecution claims, Ullah argues that: (1) the IJ and the BIA applied the incorrect legal standards and burden of proof with respect to the statutory national security bars; and (2) the BIA engaged in impermissible fact finding in addressing Ullah's pattern-or-practice argument.  For reasons that will follow, we conclude Ullah has not shown legal error in the BIA's review of his pattern-or-practice future persecution claims.  Because in this Court Ullah does not contest whether the record evidence shows a pattern or practice of persecution against former interpreters for U.S. forces in Afghanistan, this ground for denying Ullah's applications for asylum and withholding of removal stands.  We therefore decline to address the agency's alternative ruling that Ullah's asylum and withholding of removal claims are precluded by national security bars.

---

[5]By failing to raise them in his petition for review, Ullah has abandoned his persecution claims based on imputed political opinion, his claim for CAT relief, and any evidentiary issues as to the unauthenticated letters purportedly from Nangarhar officials.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

14

## A.    Exhaustion of Administrative Remedies

As a threshold matter, we must address the government's argument that we lack jurisdiction to address Ullah's argument about his pattern-or-practice claim because he did not exhaust it before the BIA.[6]

We "may review a final order or removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right."  INA § 242(d)(1), 8 U.S.C. § 1252(d)(1).  The exhaustion requirement is jurisdictional and ordinarily precludes review of a claim the petitioner did not present in his appeal to the BIA.  Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006).

This Court has held, however, that it has jurisdiction to address a petitioner's newly raised argument that is "about [an error] displayed in [the BIA's] decision not yet in existence."  Indrawati v. U.S. Att'y Gen., 779 F.3d 1284, 1299 (11th Cir. 2015).  In Indrawati, the petitioner argued that the BIA's decision reflected a lack of reasoned consideration.  Id. at 1289.  This Court rejected as "facially nonsensical" the government's contention that the petitioner had failed to exhaust her claim given that the BIA's decision did not yet exist when she made her arguments to the BIA.  Id. at 1295-96, 1299.  As such, the Court concluded that it

---

[6]We review our subject matter jurisdiction de novo.  Gonzalez-Oropeza v. U.S. Att'y Gen., 321 F.3d 1331, 1332 (11th Cir. 2003).

15

had jurisdiction to address the petitioner's reasoned-consideration issue.  Id. at 1299.

Like the petitioner in Indrawati, Ullah could not have raised his improper fact-finding claim before the BIA issued its final decision.  Thus, under Indrawati, Ullah was not required to raise his claim in order to administratively exhaust that issue.[7]

## B.    Pattern-or-Practice Claim

To establish a well-founded fear of future persecution, an asylum applicant must show that there is a reasonable possibility he will suffer persecution on account of a protected ground—here membership in a particular social group—if he returns to his country.  Mehmeti v. U.S. Att'y Gen., 572 F.3d 1196, 1200 (11th Cir. 2009).  Generally, an asylum applicant must present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." Al Najjar v. Ashcroft, 257 F.3d 1262, 1287 (11th Cir. 2001) (quotation marks omitted).  However, an applicant need not establish a reasonable possibility that he will be singled out for persecution "if the applicant instead proves that he is a

---

[7]The government cites as persuasive authority other circuits that have concluded that a petitioner's improper fact-finding claim must be raised in a motion for reconsideration to be administratively exhausted.  We, however, are bound by Indrawati's explicit jurisdictional holding.  See Horowitch v. Diamond Aircraft Indus., Inc., 645 F.3d 1254, 1258 (11th Cir. 2011) ("Under the prior panel precedent rule, we are bound by earlier panel holdings unless and until they are overruled en banc or by the Supreme Court."); see also In re Bradford, 830 F.3d 1273, 1278 (11th Cir. 2016) (explaining that we are bound by a prior panel's explicit jurisdictional holding).

16

member of, or is identified with, a group that is subjected to a 'pattern or practice' of persecution in his country of nationality." Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1352 (11th Cir. 2009); see also 8 C.F.R. §§ 208.13(b)(2)(iii), 208.16(b)(2).

The BIA has stated that persecution of a particular social group must be "systemic or pervasive" to amount to a "pattern or practice." See In re A-M-, 23 I. & N. Dec. 737, 741 (BIA 2005) (quotation marks omitted).[8] As the Seventh Circuit has explained, this "standard is high because once the court finds that a group was subject to a pattern or practice of persecution, every member of the group is eligible for [immigration relief]." Ahmed v. Gonzales, 467 F.3d 669, 675 (7th Cir. 2006).

The BIA must consider all relevant evidence but must "not engage in factfinding in the course of deciding appeals." 8 C.F.R. § 1003.1(d)(3)(iv). The BIA is limited to clear error review of the facts determined by the IJ and cannot review the evidence de novo. Id. § 1003.1(d)(3)(i). The BIA, however, "may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo." Id. § 1003.1(d)(3)(ii). A future

---

[8]Because Congress had not defined what constitutes a pattern or practice of persecution, we defer to the BIA's reasonable definition of this term. See Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1196 (11th Cir. 2006) (applying Chevron deference to the BIA's definition of what constitutes a "particular social group").

17

persecution claim presents a mixed question of law and fact, with the fact question being what harm is likely to happen if the applicant is returned to his country and the legal question being whether that predicted harm "meet[s] the legal standard for a well-founded fear of persecution." Zhu v. U.S. Att'y Gen., 703 F.3d 1303, 1312 (11th Cir. 2013). The BIA may not find the facts pertaining to the well-founded fear determination or review de novo those facts found by the IJ. Id. at 1311-14. The BIA can reweigh evidence before the IJ but only if it is "through the prism of clear error." Id. at 1315.

Here, the BIA did not engage in impermissible factfinding in reviewing Ullah's pattern-or-practice argument. The BIA's final decision correctly stated that the standard of review for the IJ's fact findings was clear error and later explicitly stated that it found "no clear error" as to the IJ's fact finding that Ullah did not have a well-founded fear of future persecution based on his status as a former interpreter. The BIA addressed Ullah's argument that the IJ "did not consider his claim of pattern or practice of persecution" and explained that Ullah had not pointed to any specific evidence that would meet the demanding "sufficiently systemic and widespread" standard for a pattern-or-practice claim. See Kazemzadeh, 577 F.3d at 1351 (stating that the agency is not required to address every argument or piece of evidence proffered by the petitioner). In support, the BIA noted that Ullah's country conditions evidence (which the IJ

18

referenced in his decision) showed only general fighting between U.S. forces and insurgent groups and provided only "some evidence" that Afghans who work for U.S. forces were harmed and did not provide sufficient evidence of harm to former interpreters to suggest a viable pattern-or-practice claim.

Moreover, the BIA did not reject any of the IJ's fact findings, did not find any facts in the first instance, and did not reference any evidence upon which the IJ did not also rely in making the ultimate determination that Ullah did not demonstrate a well-founded fear of persecution in Afghanistan. For instance, the IJ noted that Ullah introduced evidence that Afghanistan was in a state of unrest "at the hands of" the Taliban and other insurgent groups but that the country reports were vague as to the danger to Ullah as a government supporter and former linguist. In other words, the facts on which the BIA relied were already in the record and were mentioned by the IJ in his decision. Having accepted the IJ's assessment of the evidence under the proper clear-error standard, the BIA merely elaborated upon why Ullah's country conditions evidence was not sufficient to meet the demanding standard for a pattern-or-practice persecution claim.

Ullah's reliance on Zhu is misplaced. In Zhu, the BIA explicitly stated that its review was de novo and reversed the IJ's finding that there was a likelihood that the applicant would be sterilized upon her return to China. See Zhu, 703 F.3d at 1314-16. Here, in contrast, the BIA said it was applying a clear-error standard to

review the IJ's finding that Ullah did not have a well-founded fear of persecution, and the BIA cited facts from the record to <u>affirm</u> the IJ's decision not to address explicitly Ullah's pattern-or-practice claim.  In other words, the BIA's review of the pattern-or-practice evidence was not <u>de novo</u>, but rather "through the prism of clear error."  <u>See</u> id. at 1315 (emphasis omitted).

### III.  CONCLUSION

The BIA did not err in reviewing Ullah's pattern-or-practice future persecution claims.  As we already have noted, Ullah does not argue that the record compels a conclusion that there was a pattern or practice in Afghanistan of persecuting former U.S. military translators.  Accordingly, we have no occasion to disturb the denial of Ullah's applications for asylum and withholding of removal on that ground.

**PETITION DENIED.**